FILED

2012 Feb-09 PM 03:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ABBOTT POINT OF CARE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-08-S-543-NE** |
| | ) | |
| **EPOCAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Abbott Point of Care, Inc., asserts four claims of patent infringement, and one supplemental state law claim for tortious interference with contractual relations, against defendant, Epocal, Inc.[1]  In its answer to Abbott's complaint, Epocal asserted twenty-five affirmative defenses.[2]  The case is before the court on Abbott's motion for summary judgment on some of those affirmative defenses.[3]  Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes the motion is due to be granted in part and denied in part.

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court must grant summary

---

[1] *See* doc. no. 1 (Complaint).

[2] *See* doc. no. 6 (Answer).

[3] Doc. no. 152.

judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact 'exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party.'" *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (quoting *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284-85 (11th Cir. 1997)).

"In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983). Moreover,

[t]he mere existence of some factual dispute will not defeat summary

judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921); s*ee also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS[4]

### A.    The Asserted Patents

Abbott asserts that Epocal has infringed the following patents: United States Patent No. 5,112,455 ("**the '455 patent**"), entitled "Method for Analytically Utilizing Microfabricated Sensors During Wet-Up"; United States Patent No. 5,605,664 (**"the '664 patent**"), entitled "Methods and Apparatus for Rapid Equilibration of Dissolved Gas Composition"; United States Patent No. 5,609,824 ("**the '824 patent**"), entitled "Methods and Apparatus for Rapid Equilibration of Dissolved Gas Composition";

---

[4] The court finds no merit in Abbott's assertion that Epocal should not be allowed to present any evidence other than its responses to Abbott's contention interrogatories. *See, e.g.,* doc. no. 183 (Abbott's Reply in Support of its Motion for Partial Summary Judgment on Certain Epocal Affirmative Defenses), at 1. Epocal should be permitted to also rely upon evidence gathered during the discovery process. The court also finds no merit in Epocal's argument that Abbott's motion for partial summary judgment should be denied in its entirety because Abbott failed to confer with Epocal, prior to filing its motion for summary judgment, regarding whether Epocal still intended to assert all of the affirmative defenses listed in its answer. *See* doc. no. 171, at 1.

and United States Patent No. 5,614,416 ("**the '416 patent**"), entitled "Methods and Apparatus for Rapid Equilibration of Dissolved Gas Composition."[5]   All of the patents in suit cover technology used in patient bed-side blood testing systems.[6] Abbott also asserts that Epocal tortiously interfered with the employment contracts between Abbott and several of its former employers.[7]

The inventors named on each of the patents in suit assigned the patents to an entity named "i-STAT Corporation" in 1990 and 1994.[8]   Abbott Laboratories subsequently entered into an agreement to purchase i-STAT, and the purchase was completed on January 27, 2004.[9]  i-STAT formally became  known as "Abbott Point of Care, Inc." (a subsidiary of Abbott Laboratories and the plaintiff in this action) in 2006.[10]

## B.   Negotiations Between Abbott Laboratories and Epocal

Mark Shaffar, an Abbott Laboratories executive,[11] met with Dr. Imants Lauks, Epocal's CEO, in May of 2003, to discuss Abbott Laboratories' interest in purchasing

---

[5] Complaint, at ¶¶ 8-11.

[6] *Id.* at ¶ 12.  The parties use the less descriptive term "patient side blood testing systems" to describe these devices.

[7] *Id.* at ¶¶ 61-68.

[8] *See* doc. no. 157 (Abbott's Evidentiary Submission in Support of its Motion for Partial Summary Judgment on Certain Epocal Affirmative Defenses), at Exhibits B & C (Assignments).

[9] *Id.* at Exhibits D & E.

[10] *Id.* at Exhibits D, E, & F.

[11] Abbott Laboratories is a distinct entity from Abbott Point of Care, Inc.

Epocal. Dr. Lauks was a former i-STAT employee, and he was concerned about confidentiality because Abbott Laboratories also was negotiating with i-STAT. Shaffar assured Lauks that all of Epocal's business information would be kept confidential. On May 14, 2003, Abbott Laboratories and Epocal entered into a Disclosure Agreement that protected information exchanged during the two companies' negotiations.[12] Abbott Laboratories conducted due diligence investigations of Epocal in 2003 and 2004, including examinations of Epocal's technology.[13] Throughout this investigation period, employees of Abbott Laboratories made several statements in internal memoranda that they believed Epocal's devices represented "new" technology or "inventions."[14]

Abbott Laboratories proposed that it should have the option to purchase Epocal at certain stages in Epocal's business development, including the initiation of U.S. clinical studies, approval by the federal Food and Drug Administration, and launch of products into the U.S. market.[15] Abbott Laboratories also sought a "Freedom to Operate" agreement to allow it to assess Epocal's ability to operate in the relevant market. Abbott Laboratories expressed some concern over technical issues, but never

---

[12] Doc. no. 171 (Epocal's Evidentiary Submission in Opposition to Abbott's Motion for Partial Summary Judgment), at Exhibits 3 & 4.

[13] Doc. no. 171, Exhibit 5 (Deposition of Imants Lauks), at 183-84.

[14] Doc. no. 171, at Exhibits 3, 10.

[15] Doc. no. 171, at Exhibit 12.

expressed any concern that Epocal would not be able to freely operate due to infringement of the patents assigned to i-STAT prior to the acquisition of that corporation by Abbott Laboratories on January 27, 2004.[16]

During its negotiations with Epocal, Abbott Laboratories was simultaneously negotiating with i-STAT.  On November 17, 2003, Shaffar asked Dr. Lauks if he could wait until January or February to finalize a deal with Epocal, because Shaffar expected to be busy with other deals until then.[17]   As discussed above, Abbott Laboratories acquired i-STAT in a transaction that was completed on January 27, 2004.  Even after Abbott Laboratories had acquired i-STAT, it continued to negotiate with Epocal, and to express interest in what it called Epocal's "new technology."[18]  At some point in 2004, however, the negotiations between Abbott Laboratories and Epocal broke down.  In an e-mail dated September 10, 2004, Shaffar stated to other employees of Abbott Laboratories that he had spoken with Dr. Lauks, who agreed that the negotiations could go no further at that time, and that he had informed Lauks that they could always return to the negotiating table when there was more clinical data to support Epocal's sales potential.[19]

---

[16] Doc. no. 171, at Exhibit 14-15.

[17] Doc. no. 171, Exhibit 13, at documents bearing Bates Stamp Nos. E491806 & E491807.

[18] Doc. no. 171, Exhibit 17 (Deposition of Bob Kunkler), at 282-85.

[19] Doc. no. 171, at Exhibit 24.

Abbott Laboratories extended its Confidential Disclosure Agreement with Epocal on May 24, 2005, thereby expanding the disclosure period through May 24, 2006.  The privacy provisions of that agreement were extended to protect Epocal's confidential information through May 23, 2008.[20]

By December of 2006, Abbott was aware that Epocal had received approval from the federal Food and Drug Administration to market and sell the product that is accused of infringing Abbott's patents in suit.[21]  Representatives from Abbott and Epocal continued to talk sporadically through 2007, but the negotiations were not fruitful.[22]  Until Abbott filed its compliant in this case in March of 2008, neither the parent corporation, Abbott Laboratories, nor Abbott Point of Care, Inc., had expressed any concern that Epocal would infringe the asserted patents if it entered the U.S. market.

## C.    Abbott's Pre-Suit Activities

On January 25, 2008 — two months before Abbott filed the present action[23] — Peter Farnell, an Abbott Divisional Vice-President, sent an email to Glynn Perry, another Divisional Vice-President, stating that he believed the "Primary Goal" of the

---

[20] Doc. no. 171, at Exhibit 26.

[21] *See* doc. no. 171, at Exhibit 27.

[22] Lauks Deposition, at 189.

[23] Abbott's complaint was filed on March 28, 2008.

lawsuit to be commenced against Epocal was "[t]o slow them down (commercial and development) by diverting resource[s] (money and expertise). To publically [sic] show customers that we think they are infringing so they do not consider Epocal seriously. This will include a detailed explanation to make the customers understand."[24]   The "Secondary Goal" identified by Farnell was "[t]o have a settlement that shows they use our technology, they are not the innovators and what does that mean for your POCT future."[25]   The stated "Tertiary Goal" was "[t]o let other would be players know we are serious and will defend our position. This may deter or slow investment into other possible competitors."[26]

By February of 2008, Abbott had acquired an Epocal test card, as well as a complete Epocal device, and it developed at least two test protocols to determine whether the Epocal device might infringe its patents.[27]   It was not conclusively established in the record whether Abbott ever actually conducted any testing on Epocal's products. It was, however, established that Abbott did *not* subject the test card or the entire Epocal device to either of the two specific test protocols identified

---

[24] Doc. no. 171, Exhibit 28, at document bearing Bates Stamp No. APOC 0260003621 (bracketed alterations supplied).

[25] *Id.*

[26] *Id.* The term "tertiary," when used as an adjective, means something that is of the third order or rank.

[27] Doc. no. 171, Exhibit 8 (Deposition of Mike Zelin), at 265; *id.,* Exhibit 29 (Deposition of Graham Davis), at 219; *id.,* Exhibit 30 (Second Deposition of Graham Davis), at 9.

during the deposition of Mike Zelin, Abbott's Vice President of Research and Development.[28]

## D.   Abbott's Post-Filing Conduct

In the preliminary infringement contentions that were served by Abbott on June 17, 2008, Abbott identified at least five alleged "gas equilibration reservoirs" on the Epocal test card.[29]   In Abbott's final infringement contentions, served July 30, 2010, it identified a single area on the Epocal test card as the alleged gas equilibration reservoir.   That identified area was not among the five alleged "gas equilibration reservoirs" identified in Abbott's preliminary infringement contentions.[30]

After Abbott filed this suit, it generated company-wide sales memoranda, instructing its sales force to "engage the customer in the Epocal discussion," and to "plant seeds of doubt" about the quality of Epocal's product.[31]   Abbott's salespeople also were instructed to make their customers aware of Abbott's patent-infringement suit against Epocal and the potential negative effects it could have for customers of Epocal, including Epocal's potential inability to sell its products if an injunction was entered against it.[32]   Abbott acknowledges that its salespeople put these directives

---

[28] Zelin Deposition, at 268, 271.

[29] *See* doc. no 171, at Exhibit 33 (Preliminary Infringement Contentions).

[30]   *See* doc. no 171, at Exhibit 34 (Final Infringement Contentions).

[31] Doc. no. 171, Exhibit 38, at documents bearing Bates Stamp Nos. APOC 0014496-97.

[32] *Id.* at document bearing Bates Stamp No. APOC 0014525; doc. no. 171, Exhibit 41, at

into action, informing at least hundreds of customers about the suit against Epocal and the potential risks it created.[33]  When current or potential customers did consider using the Epocal system, Abbott directed its attorneys to send a letter to those customers.   For example, on April 1, 2009, Abbott's attorney sent a letter to Children's Healthcare of Atlanta ("CHOA"), informing that organization of this lawsuit and of Abbott's confidence that it would prevail on its infringement allegations against Epocal.  Abbott also sated that it "firmly believes that Epocal's offer for sale of these Epocal products [to CHOA] have and will constitute further acts of willful infringement of the APOC [Abbott Point of Care] Patents."[34]  The letter further stated:

> In an attempt to preserve its business relationship with CHOA in light of Epocal's infringing conduct, APOC commercial representatives recently attempted to contact representatives of CHOA.  The purpose of that call was for APOC to make a business proposal in an attempt to maintain the CHOA business.  During that call, the APOC representative was advised that CHOA employees had been directed not to talk to APOC employees, and the call was terminated before the APOC offer could be extended.

> The sole purpose of this letter is to respectfully request that CHOA open a line of communication to APOC so that the commercial offer mentioned above can be extended.   We would very much appreciate a prompt indication of CHOA's willingness to at least listen

---

document bearing Bates Stamp No. APOC 00014561; doc. no. 171, Exhibit 42, at document bearing Bates Stamp No. APOC 0015174.

[33] *See* doc. no. 171, at Exhibits 43-47.

[34] Doc. no. 171, Exhibit 48, at 1 (bracketed alterations supplied).

to APOC's counteroffer.[35]

### E.    Former Abbott Employees Now Working For Epocal

Four persons who originally worked for Abbott, but who now are employed by Epocal are Daniel McClain, Mark Maund, Margaret ("Peggy") Wachowski, and Martin Berner — all of whom entered into employment agreements with Abbott in February of 2004.[36] Daniel McClain left Abbott's employment on June 22, 2007.[37] Peggy Wachowski did so on August 10, 2007.[38] Mark Maund did so on December 14, 2007.[39] Martin Berner did so sometime in early 2008.[40] The record also contains an employment agreement executed by between Abbott and Wendy Thompson in October of 2007,[41] but that makes little sense because Wendy Thompson left Abbott on September 21, 2007.[42] All of the individuals named in this paragraph now work for Epocal.

---

[35] *Id.* at 2.

[36] Doc. no. 157, at Exhibit G (Daniel McClain Employee Agreement, executed February 11, 2004); Exhibit H (Mark Maund Employee Agreement, executed February 12, 2004); Exhibit I (Margaret Wachowski Employee Agreement, executed February 11, 2004); Exhibit J (Wendy Thompson Employee Agreement, executed October 15, 2007); Exhibit K (Martin Berner Employee Agreement, executed February 12, 2004).

[37] *See* doc. no. 171 (Epocal's Evidentiary Submission in Opposition to Abbott's Motion for Partial Summary Judgment), at Exhibit 49.

[38] *See id.* at Exhibit 50.

[39] *See id.* at Exhibit 52.

[40] *See id.,* Exhibit 53 (Deposition of Richard Epps), at 301-02.

[41] Doc. no. 157, at Exhibit J (Wendy Thompson Employee Agreement, executed October 15, 2007).

[42] *See* doc. no. 171, at Exhibit 51.

11

The exit interview form signed by each of the foregoing individuals contained a provision stating: "For those interviews that raise a concern of possible breach of the Employee Agreement and/or included participation by attorney, a letter will be sent by the attorney to the employee and future employer, where applicable, reminding the employee of the ongoing obligations under the Employee Agreement."[43]   Furthermore, at least three of these individuals — Martin Berner, Wendy Thompson, and Dan McClain — notified Abbott during their respective exit interviews that they were leaving Abbott to work for Epocal.[44]   Abbott even learned what position Martin Berner and Dan McClain would occupy at Epocal during their respective exit interviews.[45]   Abbott also received verbal notice from Mark Maund, prior to his departure from Abbott, of the position that he would occupy at Epocal.[46]

Of the four former Abbott employees named above, only Dan McClain received a letter from Abbott's in-house counsel concerning his obligations under his Employment Agreement with Abbott.[47]   That letter stated:

> In your position in the Point of Care business of Abbott

---

[43] *See, e.g., id.,* Exhibit 54, at 4.

[44] *See* doc. no. 171, Exhibit 49, at document bearing Bates Stamp No. APOC0680000029; Exhibit 51, at document bearing Bates Stamp No. APOC0680000040; and Exhibit 55, at document bearing Bates Stamp No. APOC 0680000056.

[45] *See* doc. no. 171, Exhibit 49, at document bearing Bates Stamp No. APOC0680000029; *id.,* Exhibit 55, at document bearing Bates Stamp No. APOC 0680000056.

[46] Doc. no. 171, Exhibit 56 (Deposition of Jody Tirinato), at 276, 285.

[47] Doc. no. 171, Exhibit 17 (Deposition of Bob Kunkler), at 221-22.

Laboratories ("Abbott"), you had access to a great deal of confidential information and trade secrets regarding all aspects of Abbott's business. This information is the property of Abbott.  Enclosed is a copy of your Employee Agreement with Abbott, which includes many obligations that continue after your termination from Abbott.   Following, I have highlighted some of them.

Paragraph 8 of your Employee Agreement obligates you not to use or disclose Abbott Confidential Information without Abbott's consent.  The Agreement also provides that, for a period of one year following termination of your Abbott employment, you are prohibited from:

- contributing to any research, discovery, development, manufacture, importation, marketing, promotion, sale or use of Competing Products.

- engaging in any employment in which Abbott Confidential Information would reasonably be considered useful without Abbott's written consent.

- promoting or marketing Competing Products to Abbott Customers that you called upon on behalf of Abbott during your last two years with Abbott.

Finally, Paragraph 12 prohibits you, for a period of two years following termination of your Abbott employment, without Abbott's written consent, from soliciting or assisting to solicit for employment any Abbott employee about whom you acquired knowledge through your employment with Abbott.

We trust you will abide by your obligations to Abbott.[48]

Until Abbott commenced this lawsuit, it did not object to Epocal's hiring of any of

---

[48] Doc. no. 171, at Exhibit 57.

Abbott's former employees.[49]

## III. DISCUSSION

Abbott originally moved for partial summary judgment on the following Epocal affirmative defenses:  statute of limitations; laches; unclean hands; lack of equity; implied license; estoppel; waiver; patent misuse; vexatious litigation; public policy; lack of special consideration; lack of standing; lack of proximate cause; failure to state a claim upon which relief can be granted; failure to plead with specificity; improper venue; and failure to join indispensable parties.[50]  In its response to Abbott's motion for partial summary judgment, Epocal acknowledged that it did not intend to assert at trial the affirmative defenses of statute of limitations, patent misuse, vexatious litigation, public policy, lack of special consideration, lack of standing, failure to state a claim upon which relief can be granted, failure to plead with specificity, and improper venue.[51]  Additionally, Epocal did not make any substantive arguments with regard to the defense of failure to join indispensable parties, but instead only asserted that it reserved the right to pursue that defense on appeal, if necessary.[52]  As a result, the only defenses that remain the subject of Abbott's motion

---

[49] Kunkler Deposition, at 218.

[50] *See* doc. no. 154, at i-ii.

[51] *See* doc. no. 171 (Epocal's brief in opposition to Abbott's motion for partial summary judgment on certain Epocal defenses), at 1.

[52] *Id.* at 1 n.1.

for partial summary judgment are laches, unclean hands, lack of equity, implied license, estoppel, waiver, and proximate cause.  Each is addressed in the following sections.

## A.    Laches

Epocal asserted in its answer that Abbott's "claims are barred, in whole or in part, . . . by the doctrine of laches."[53]  In response to an interrogatory requesting the basis for that defense, Epocal stated:

> Abbott's interference claims based on the purported "Confidentiality and Employment Agreements" with Martin Berner, Wendy Thompson, Dan McClain, Mark Maund, and Peggy Wachowski are barred by laches.  On information and belief, Abbott knew these employees had been working for Epocal for many months and Abbott raised no objection or otherwise took no action to enforce its alleged rights vis -a-vis those individuals or Epocal.  Additionally, Abbott has since taken no direct action against the former employees, nor sought any temporary or preliminary injunctive relief against Epocal for employing them.[54]

Epocal thus appears only to assert the laches defense to Abbott's claim for tortious interference with contractual relations, not to its claims for patent infringement.

Under New Jersey law, which the parties agree applies to Abbott's claim for

---

[53] Doc. no. 6, at 9.

[54] Doc. no. 157 (Abbott's Evidentiary Submission in Support of its Motion for Partial Summary Judgment on Certain Epocal Affirmative Defenses), Exhibit P (Epocal's First Supplemental Objections and Responses to Abbott's First Set of Interrogatories), at 4-5 (First Supplemental Response to Interrogatory No. 7).

tortious interference with contractual relations,[55]

The doctrine of laches "is invoked to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party." *Knorr v. Smeal*, 178 N.J. 169, 180–81, 836 A.2d 794 (2003). *See also Borough of Princeton v. Bd. of Chosen Freeholders of Mercer County*, 169 N.J. 135, 157, 777 A.2d 19 (2001) (noting that "'[l]aches is an equitable defense that may be interposed in the absence of the statute of limitations,' and is defined as 'an inexcusable delay in asserting a right.'" (quoting *Nw. Covenant Med. Ctr. v. Fishman*, 167 N.J. 123, 140, 770 A.2d 233 (2001))); *County of Morris v. Fauver*, 153 N.J. 80, 105, 707 A.2d 958 (1998) (defining laches as "'where there is unexplainable and inexcusable delay in enforcing a known right whereby prejudice has resulted to the other party because of such delay.'" (quoting *Dorchester Manor v. Borough of New Milford*, 287 N.J. Super. 163, 171, 670 A.2d 600 (Law Div.1994), *aff'd*, 287 N.J. Super. 114, 670 A.2d 576 (App. Div. 1996))). "The policy behind laches is to discourage stale claims [and t]he time constraints imposed are flexible under the doctrine." *County of Morris, supra*, 153 N.J. at 105, 707 A.2d 958 (citations omitted).

"Laches may only be enforced when the delaying party had sufficient opportunity to assert the right in the proper forum and the prejudiced party acted in good faith believing that the right had been abandoned." *Knorr, supra*, 178 N.J. at 181, 836 A.2d 794 (citations omitted). We have emphasized that "[t]he key factors to be considered in deciding whether to apply the doctrine are the length of the delay, the reasons for the delay, and the changing conditions of either or both parties during the delay." *Ibid*. (citation and internal quotation marks omitted). In the final analysis, "[t]he core equitable concern in applying laches is whether a party has been harmed by the delay." *Ibid*.

---

[55] *See* doc. no. 159 (Epocal's Brief in Support of Motion for Summary Judgment), at 59-61 (asserting that, under Alabama choice of law principles, New Jersey law applies to plaintiff's tortious interference claim because New Jersey is the state where the injury occurred); doc. no. 173 (Abbott's Brief in Opposition to Epocal's Motion for Summary Judgment), at 55-68 (also asserting arguments under New Jersey law).

*U.S. ex rel. U.S. Dept. of Agriculture v. Scurry*, 940 A.2d 1164, 1170-71 (N.J. 2008) (bracketed alterations in original).

Abbott first asserts that there was no "inexcusable delay" between the date its four former employees began work for Epocal and the assertion of its tortious interference claim in this action. This court agrees. The first Abbott employee to leave for employment at Epocal was Daniel McClain, on June 22, 2007. The last was Martin Berner, in early 2008. Abbott filed this lawsuit on March 28, 2008, only nine months after Dan McClain went to work for Epocal, and no more than two months after Martin Berner did so. Epocal asserts that Abbott should have sent letters to its former employees, accusing them of failure to comply with their employment agreements, or taken some other action to prevent those employees from gong to work at Epocal. But Epocal has cited no law, and this court knows of none, requiring those steps to be taken before filing a claim for tortious interference with Abbott's contractual relations.

Furthermore, New Jersey courts have characterized laches as "'an equitable defense that may be interposed *in the absence of the statute of limitations*,' and is defined as 'an inexcusable delay in asserting a right.'" *Borough of Princeton*, 777 A.2d at 32 (quoting *Fishman*, 770 A.2d at 244) (emphasis supplied). Here, the New Jersey legislature has adopted a six-year statute of limitations for filing claims of

tortious interference.  N.J. Stat. Ann. § 2A:14-1 (2000).  *See also Kant v. Seton Hall University,* 422 Fed. Appx. 186, 189 (3rd Cir. 2011) ("The New Jersey statute of limitations for a claim for tortious interference with prospective economic advantage is six years.").  In light of the legislative decision to allow such a generous period for filing tortious interference claims, it would strain the bounds of reason to hold that a delay of mere months before filing this suit is inequitable and warrants the application of the doctrine of laches.  *See, e.g., Peter Letterese & Associates v. World Institute of Scientology Enterprises,* 533 F.3d 1287, 1320-21 (11th Cir. 2008) (holding, in a copyright infringement case, "that there is a strong presumption that a plaintiff's suit is timely if it is filed before the statute of limitations has run," and that "[o]nly in the most extraordinary circumstances will laches be recognized as a defense").  Accordingly, summary judgment is due to be granted in favor of Abbott on Epocal's assertion of the affirmative defense of laches.[56]

## B.    Unclean Hands and Lack of Equity

Epocal asserted in its answer that Abbott's "claims [for injunctive and other equitable relief] are barred by the doctrine of unclean hands," and that Abbott, "having failed to do equity, is not entitled to equity."[57]  In response to an interrogatory

---

[56] Because Abbott did not unreasonably delay in filing its claim for tortious interference with contract, the court need not consider whether Epocal was harmed by any delay.

[57] Doc. no. 6 (Answer) at 10, ¶ 13 & 14, ¶ 23 (bracketed alteration supplied).

requesting the basis for those defenses, Epocal stated:

> [I]n or around 2003, senior Abbott executives held discussions with Epocal executives, including Imants Lauks, concerning a possible strategic transaction, including a possible acquisition of Epocal. As part of these discussions, Epocal described in detail its technology to Abbott. These discussions occurred before Abbott acquired i-STAT and the i-STAT patent portfolio comprising the patents asserted in this lawsuit. During these discussions Epocal and Abbott discussed Epocal's freedom to operate in the point of care blood testing market in light of various patents, including the patents in the i-STAT patent portfolio.

> Subsequently, Abbott acquired i-STAT and the asserted patents in this lawsuit. In subsequent discussion between Abbott and Epocal, Abbott never suggested that it believed Epocal's products infringed any i-STAT patent. Abbott's consideration of acquiring Epocal further evidences that Abbott did not believe that Epocal's products infringed the i-STAT patents.

> Further answering, with respect to Abbott's interference claims, Abbott has failed to fairly and equitably compensate certain employees, acquiesced to employee(s) joining Epocal, and permitted certain employees under similar agreements to leave Abbott and work for competitors.[58]

Epocal thus asserts the affirmative defenses of unclean hands and lack of equity to both Abbott's patent infringement and tortious interference with contractual relations claims.

The doctrine of unclean hands is designed to enforce "the equitable maxim that

---

[58] Doc. no. 157 (Abbott's Evidentiary Submission in Support of its Motion for Partial Summary Judgment on Certain Epocal Affirmative Defenses), Exhibit O (Epocal's Objections and Responses to Abbott's First Set of Interrogatories), at 4-5 (Response to Interrogatory No. 4) (bracketed alteration supplied).

'he who comes into equity must come with clean hands.'" *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery,* 324 U.S. 806, 814 (1945).

The doctrine

> closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant.  That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abetter of iniquity.' *Bein v. Heath*, 6 How. 228, 247, 12 L. Ed. 416.  Thus while 'equity does not demand that its suitors shall have led blameless lives,' *Loughran v. Loughran*, 292 U.S. 216, 229, 54 S. Ct. 684, 689, 78 L. Ed. 1219[ (1934)], as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245, 54 S. Ct. 146, 147, 78 L. Ed. 293[ (1933)]; *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387, 64 S. Ct. 622, 624, 88 L. Ed. 814[ (1944)]; 2 Pomeroy, *Equity Jurisprudence* (5th Ed.) ss 397-399.

*Precision Instrument Manufacturing Co.*, 324 U.S. at 814-15 (bracketed alterations supplied).

> The trial court has broad discretion under the doctrine of unclean hands. *Id.* at 815, 65 S. Ct. 993 ("This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." (internal quotation omitted)).

*Princess Cruises, Inc. v. U.S.*, 397 F.3d 1358, 1369 (Fed. Cir. 2005).

Epocal asserts that Abbott's hands are not clean because it brought this lawsuit

"as a business strategy to drain Epocal's resources and scare away potential customers," and not because it had "a good faith basis to believe that Epocal was infringing the patents-in-suit."[59]  To support this assertion, Epocal first relies on Peter Farnell's statement that the "primary goals" of this lawsuit were to divert resources from Epocal and to prevent potential customers from seriously considering Epocal's products.  The court concludes that is sufficient evidence of Abbott's unclean hands to allow the defense to be presented to the jury.  Accordingly, Abbott's motion for summary judgment will be denied with regard to Epocal's assertion of unclean hands as an affirmative defense to patent infringement.

Epocal asserts that the unclean hands defense can also apply to Abbott's tortious interference claim.  According to Epocal, Abbott's hands are unclean because it failed to prevent some of its former employees from going to work at Epocal, and because it failed to advise those former employees that their employment at Epocal might constitute a breach of their employment agreements with Abbott.  This is essentially the same argument Epocal made in support of its laches defense, which has already been rejected.  There is no evidence that Abbott has unclean hands due to its failure to interfere, prior to filing this lawsuit, with its former employees' future employment with Epocal.  Accordingly, summary judgment is due to be granted on

---

[59] Doc. no. 171, at 16.

Epocal's unclean hands defense, insofar as that defense is asserted against Abbott's claim for tortious interference with contractual relations.

Finally, these same holdings apply to Epocal's "lack of equity" defense, as Epocal asserted the same grounds for that defense as it did for the unclean hands defense.  Accordingly, Epocal will be permitted to rely upon "lack of equity" as a defense to Abbott's claims for patent infringement, but not as a defense to Abbott's claim for tortious interference with contractual relations.

## C.    Implied License, Estoppel, and Waiver

Epocal's answer asserts that Abbott's claims "are barred by [an] implied license," and that Abbott's claims "are bared, in whole or in part, by the doctrines of estoppel and waiver."[60]  In response to interrogatories requesting the basis for those defenses, Epocal provided the same explanation it provided for its laches, unclean hands, and lack of equity defenses.[61]  Indeed, Epocal relies upon the same facts and most of the same legal arguments to support all of these defenses;[62] even so, the

---

[60] Doc. no. 6 (Answer) at 10, ¶ 4 & 10, ¶ 12 (bracketed alteration supplied)

[61] Doc. no. 157 (Abbott's Evidentiary Submission in Support of its Motion for Partial Summary Judgment on Certain Epocal Affirmative Defenses), Exhibit O (Epocal's Objections and Responses to Abbott's First Set of Interrogatories), at 11 (Response to Interrogatory Nos. 8 & 9).

[62] *See* doc. no. 171, at 22 n.5 ("Other defenses asserted by Epocal [including waiver and implied license] raise similar issues of whether Abbott is prohibited from asserting infringement based upon its conduct. . . .  For the same reasons that Abbott's motion for summary judgment on the defense of equitable estoppel should be denied, the Court should also deny the motion directed to these defenses.") (bracketed alteration supplied).

analysis does differ slightly when evaluating these defenses under state and federal law.

**1.   Implied license, estoppel, and waiver defenses to patent infringement**

The doctrines of implied license and equitable estoppel, as applied in the field of patent law, are related yet distinct.

> In patent law, an implied license merely signifies a patentee's waiver of the statutory right to exclude others from making, using, or selling the patented invention. *Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081, 4 USPQ2d 1044, 1048 (Fed. Cir.1987). In the words of the Supreme Court,
>
> > No formal granting of a license is necessary in order to give it effect. Any language used by the owner of the patent, or any conduct on his part exhibited to another from which that other may properly infer that the owner consents to his use of the patent in making or using it, or selling it, upon which the other acts, constitutes a license and a defense to an action for a tort.
>
> *De Forest Radio Tel. Co. v. United States*, 273 U.S. 236, 241, 47 S. Ct. 366, 367, 71 L. Ed. 625 (1927).

*Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997).

One way in which an implied license may arise is through equitable estoppel. *Id.* (noting that "courts and commentators relate that implied licenses arise by

acquiescence, by conduct, by equitable estoppel (estoppel in pais), or by legal estoppel") (citations omitted).  Even so, "a formal finding of equitable estoppel [is not] a prerequisite to a legal conclusion of implied license."  *Id.* at 1581 (citation omitted) (bracketed alteration supplied).  Instead, "the estoppel doctrines serve as guidelines" in the implied license analysis.  *Id.*

> An implied license by equitable estoppel requires proof that: (1) the patentee, through statements or conduct, gave an affirmative grant of consent or permission to make, use, or sell to the alleged infringer; (2) the alleged infringer relied on that statement or conduct; and (3) the alleged infringer would, therefore, be materially prejudiced if the patentee is allowed to proceed with its claim.

*Winbond Electronics Corp. v. International Trade Commission*, 262 F.3d 1363, 1374 (Fed. Cir. 2001).

Epocal has offered no evidence that Abbott ever *affirmatively granted* it permission to make, use, or sell its products, either through words or conduct.  Abbott investigated Epocal's ability to operate in the relevant market without infringing the patents, but there is no evidence that Abbott ever affirmatively indicated to Epocal, either through statements or conduct, that it could proceed to occupy the market.  Absent any such evidence, the implied license defense must fail.  Further, the court can discern no basis for Epocal's waiver defense other than the same grounds asserted in support of the implied license defense.  Accordingly, the waiver defense to patent

infringement also fails.

The analysis on Epocal's equitable estoppel defense to patent infringement is similar, but there are some important distinctions.  The Federal Circuit has expressed the requirements of the equitable estoppel defense in the following manner:

> An [equitable] estoppel case ... has three important elements. [1] The actor, who usually must have knowledge of the true facts, communicates something in a misleading way, either by words, conduct or silence. [2] The other relies upon that communication. [3] And the other would be harmed materially if the actor is later permitted to assert any claim inconsistent with his earlier conduct.

*A.C. Aukerman Co. v. R.L. Chaides Construction Co.*, 960 F.2d 1020, 1041 (Fed. Cir. 1992) (bracketed alterations in original).  These elements were elaborated in *ABB Robotics, Inc. v. GMFanuc Robotics Corp.,* 52 F.3d 1062 (Fed. Cir. 1995), holding that:

> Three elements are required to prove estoppel.  The first is that the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that he does not intend to enforce the patent against the alleged infringer.  The conduct may include specific statements, action, inaction, or silence where there was an obligation to speak.  The second element is that the alleged infringer relies on the patentee's conduct. The final element is that due to the reliance, the alleged infringer will be materially prejudiced if the patentee is permitted to proceed with its infringement suit.  Being an equitable doctrine, estoppel is committed to the sound discretion of the trial judge whose decision we review under the abuse of discretion standard.

*Id.* at 1063-64 (citing *Aukerman,* 960 F.2d at 1028).  Importantly, a claim of equitable

estoppel — one that is not based on an implied license theory — does not require

evidence of an affirmative grant of consent or permission to make, use, or sell (*i.e.,*

a "license").  Instead, equitable estoppel

> focuses on "misleading" conduct suggesting that the patentee will not
> enforce patent rights. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
> 960 F.2d 1020, 1041-44, 22 USPQ2d 1321, 1335-38 (Fed. Cir. 1992).
> In *Aukerman*, we described a typical equitable estoppel situation as one
> in which (1) the infringer knows of the patent, (2) the patentee objects
> to the infringer's activities, (3) but the patentee does not seek relief until
> much later, (4) thereby misleading the infringer to believe the patentee
> will not act. *Id*. at 1042-43, 960 F.2d 1020, 22 USPQ2d at 1335-36.

*Wang Laboratories,* 103 F.3d at 1581.  Silence can constitute the "misleading

conduct" necessary for a finding of equitable estoppel, but only if there are also

"other facts respecting the relationship or contacts between the parties to give rise to

the necessary inference that the claim against the defendant is abandoned."

*Aukerman,* 960 F.2d at 1042 (citations omitted).  *See also R2 Medical Systems, Inc.*

*v. Katecho, Inc.*, 931 F.Supp. 1397, 1416 (N.D. Ill. 1996) ("Misleading conduct may

include specific statements, action, inaction, or silence where there is a clear duty to

speak.") (citing *Aukerman,* 960 F.2d at 1042).

Upon review of the evidence, the court concludes there are genuine issues of

material fact preventing the entry of summary judgment in Abbott's favor on Epocal's

affirmative defense of equitable estoppel, insofar as that defense is asserted against

Abbott's patent infringement claims.  Specifically, the record, construed in a light most favorable to Epocal, demonstrates that Abbott gained intimate knowledge of Epocal's technology through negotiations dating back to 2003, but it never suggested that Epocal's products might infringe Abbott's patents.  Moreover, Abbott referred to Epocal's developing product as "new technology," and indicated during negotiations that Epocal would be free to pursue other commercial relationships if Abbott did not ultimately purchase Epocal.  Finally, the record supports a conclusion that Epocal, in reliance upon both Abbott's silence and representations, continued to expend substantial time and resources in developing and marketing the accused products.  In light of these facts, Abbott's motion for summary judgment will be denied with regard to Epocal's defense of equitable estoppel to patent infringement.

## 2.    Estoppel and waiver defenses to tortious interference claim

Epocal also asserted the defenses of estoppel and waiver to Abbott's tortious interference claim.  To succeed on the estoppel defense under New Jersey law, Epocal must demonstrate "that [Abbott] engaged in conduct, either intentionally or under circumstances that induced reliance, and that [Epocal] acted or changed [its] position to [its] detriment."  *Knorr v. Smeal,* 836 A.2d 794, 799 (N.J. 2003) (citing *Miller v. Miller*, 478 A.2d 351, 355 (N.J. 1984)).

Equitable estoppel is applicable where "conduct, either express or

implied, . . . reasonably misleads another to his prejudice so that a
repudiation of such conduct would be unjust in the eyes of the law."
*Ridge Chevrolet–Oldsmobile, Inc. v. Scarano*, 238 N.J. Super. 149, 154,
569 A.2d 296 (App. Div.1990) (quoting *Miller v. Teachers' Pension &
Annuity Fund*, 179 N.J. Super. 473, 477, 432 A.2d 560 (App. Div.
1981)).  A party asserting equitable estoppel may rely upon conduct,
inaction, representation of the actor, misrepresentation, silence or
omission. *Id.* (citing *Fairken Assoc. v. Hutchin*, 223 N.J. Super. 274,
280, 538 A.2d 465 (App. Div. 1987)).  The party claiming the estoppel
must have relied on its adversary's conduct in such a manner as to
change his position for the worse and that reliance must have been
reasonable in that the party claiming estoppel did not know nor should
it have known that its adversary's conduct was misleading. *See Heckler
v. Community Health Serv.'s*, 467 U.S. 51, 59, 104 S. Ct. 2218, 81 L.
Ed.2d 42 (1984).

*Barone v. Leukemia Society of America*, 42 F. Supp. 2d 452, 464 (D. N.J. 1998).

Epocal relies upon the same set of operative facts to support its waiver and
equitable estoppel defenses to tortious interference that it relied upon to support its
laches defense to tortious interference.  For the same reasons stated with regard to the
laches defense, the court concludes that summary judgment should be granted on the
equitable estoppel and waiver defenses.  Abbott did not engage in any inequitable
conduct by waiting mere months after its employees left to work at Epocal to inform
Epocal that it believed those employees were violating their employment agreements
with Abbott.  Epocal did not reasonably rely on Abbott's delay, and, consequently,
any prejudice Epocal may have suffered as a result of continuing to employ the
former Abbott employees cannot be attributed to Abbott.  Therefore, summary

judgment is due to be granted in Abbott's favor on Epocal's defense of equitable estoppel to tortious interference.  Further, because Epocal relies upon the same arguments to support its waiver defense to tortious interference as it relied upon for equitable estoppel, summary judgment is due to be granted on the waiver defense as well.

## D.    Lack of Proximate Cause

Epocal asserted in its answer that Abbott's "claimed injuries and damages, if any, are the proximate result of acts or omissions of others, for whom this defendant owes no legal responsibility."[63]  Epocal now acknowledges, however, that lack of proximate cause is not actually an affirmative defense.[64]  Accordingly, summary judgment is due to be granted in Abbott's favor on Epocal's purported affirmative defense of lack of proximate cause.  Epocal will, however, still be permitted to argue, in response to Abbott's case-in-chief, that Abbott failed to establish proximate causation as an element of any of its claims.

## IV. CONCLUSION AND ORDERS

In accordance with the foregoing, Abbott's motion for summary judgment on

---

[63] Doc. no. 6, at 9, ¶ 6.

[64] Doc. no. 171, at 25 n. 8 ("Under New Jersey law that governs Abbott's tortious interference claim, lack of proximate causation is not an affirmative defense, but is instead an essential element of the tortious interference plaintiff's case.").  Epocal only pled lack of proximate cause as an affirmative defense "out of an abundance of caution."  *Id.*

certain of Epocal's affirmative defenses is GRANTED in part and DENIED in part. The motion is DENIED with respect to Epocal's assertion of equitable estoppel, unclean hands, and lack of equity as affirmative defenses to patent infringement. The motion is GRANTED in all other respects. Accordingly, Epocal's affirmative defenses of statute of limitations, laches, implied license, waiver, patent misuse, vexatious litigation, public policy, lack of special consideration, lack of standing, proximate cause, failure to state a claim upon which relief can be granted, failure to plead with specificity, improper venue, and failure to join indispensable parties are DISMISSED with prejudice. Epocal's affirmative defenses of estoppel, unclean hands, and lack of equity also are DISMISSED with prejudice, insofar as they were asserted as defenses against Abbott's tortious interference claim.

As all issues raised on summary judgment now have been resolved, this case is ready for trial, and it will be set for pretrial conference and trial by separate order.

DONE this 9th day of February, 2012.

United States District Judge

30