FILED
2012 Apr-18  PM 03:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **ABBOTT POINT OF CARE, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-08-S-543-NE** |
| | ) | |
| **EPOCAL, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER ON MOTIONS *IN LIMINE* BY DEFENDANT EPOCAL, INC.

This opinion addresses the following motions *in limine* filed by defendant, Epocal, Inc. ("Epocal"): *i.e.,* (1) motion to exclude evidence and argument that plaintiff, Abbott Point of Care, Inc. ("Abbott" or, as plaintiff's counsel prefer, "APOC") has been harmed by Epocal's alleged conduct;[1] (2) motion to exclude evidence and argument regarding Epocal's federal Food and Drug Administration 510(k) submissions;[2] (3) motion to exclude documents that use certain claim terms outside the context of the patents-in-suit;[3] and (4) motion to exclude arguments and evidence regarding solicitation of employees other than the five at issue in Abbott's

---

[1] Doc. no. 244.
[2] Doc. no. 245.
[3] Doc. no. 246.

tortious interference allegations.[4]

## I. EPOCAL'S MOTION TO EXCLUDE EVIDENCE AND ARGUMENT THAT ABBOTT HAS BEEN HARMED BY EPOCAL'S ALLEGED CONDUCT

This court entered an order on March 22, 2010, granting the parties' joint motion to bifurcate the trial and to stay discovery on the bifurcated issues. That order stated, in pertinent part:

> Pursuant to Federal Rule of Civil Procedure 42(b), it is ORDERED that this litigation shall be divided into two phases. During Phase One, the parties shall litigate the issues of patent infringement liability, patent infringement willfulness, patent infringement injunctive relief, and tortious interference liability (except for any element of proof related to the "fact of damages"). If plaintiff should prevail on any of the foregoing issues, then, during Phase Two, the parties shall litigate the issues of patent infringement damages, any remaining tortious interference liability (*e.g.*, the "fact of damages"), tortious interference damages, and tortious interference injunctive relief.[5]

The order also stated that discovery should proceed with regard to all issues covered in Phase One, but that discovery on all issues reserved for consideration in Phase Two would be stayed, pending a determination on the issues covered in Phase One.[6] Epocal now seeks to exclude from presentation to the jury "all evidence that Abbott has been harmed, or perceives that it has been harmed, in any way by Epocal's

---

[4] Doc. no. 247.

[5] Doc. no. 117, at 1-2 (footnote omitted).

[6] *Id.* at 2.

alleged infringement of the asserted patent claims or by Epocal's employment of five former APOC employees," because any such evidence would contravene the court's bifurcation order.[7]   More specifically, Epocal points to several items identified on Abbott's March 22, 2010 exhibit list, including

> an Epocal market analysis [PX 154], APOC "Capital IQ" financial information [PX 273], sales projections for the i-Stat device [PX 354], customer lists [PX 355], an Epocal email to a potential customer that was passed along to APOC [PX 356], a list of APOC accounts "lost" to Epocal [PX 395], APOC customer revenue and sales volume [PX 432], APOC emails regarding meetings with APOC customers or potential customers [PX 403 & 438] and emails concerning competition with Epocal [PX 416 & 418], agreements between Epocal and its customers PX 325, 326, 327, & 328], and similar information.   The list also includes documents concerning Epocal's relationship and agreements with Alere, and Alere's financial information [PX 449, 450, & 451].[8]

Epocal also points to two individuals named on Abbott's March 22, 2010 witness list: *i.e.,* Lisa Reece, who "may have discoverable information regarding both the use and sale of Abbott and i-STAT products, as well as Abbott's competition with other entities, such as Epocal," and Greg Arnsdorf, who "is involved in marketing."[9]

Epocal asserts that this evidence could only be relevant to the issue of whether Abbott was harmed, or perceived that it was harmed, by Epocal's alleged misconduct,

---

[7] Doc. no. 244, at 1.

[8] *Id.* at 3-4 (citations to Epocal's exhibits omitted and replaced with bracketed alterations showing the numbers assigned by plaintiff's counsel).

[9] *Id.* at 4.

and for that reason it should be excluded from this phase of the trial, during which the jury will only be considering the issues of patent infringement liability, patent infringement willfulness, and tortious interference liability, exclusive of any element or proof related to the "fact of damages."  Moreover, Epocal alleges that, even if some of the proposed evidence might be relevant to the issue of patent infringement injunctive relief, it should not be presented to the jury, because the issue of injunctive relief will be decided by the court, not the jury, and all evidence related to that issue will be presented at a later hearing, after the conclusion of the jury trial.

The court agrees that evidence of harm or perceived harm suffered by Abbott should not be presented to the jury during the "Phase One" trial, because any such evidence would contravene the court's bifurcation order, confuse the jury, and cause undue prejudice to Epocal's defense.  Abbott does not even contest this central point.[10]  Indeed, Abbott admits that most of the exhibits cited by Epocal in its motion were only included in its trial exhibit list "for use at the post-trial injunctive hearing."[11]  Therefore, Epocal's motion will be granted as to those documents identified as Plaintiff's Exhibits ("PX") 273, 325-28, 354-56, 395, 403, 416, 418, 432,

---

[10] Doc. no. 265 (Abbott's Response to Epocal's Motion *In Limine* to Exclude Evidence and Argument that Abbott Has Been Harmed by Epocal's Alleged Conduct), at 1 ("Abbott does not intend to introduce at trial evidence related to the fact or amount of damages it has suffered as a result of Epocal's infringement and tortious interference; those are issues reserved for Phase II proceedings.").

[11] *Id.*

438, and 449-51.

Even so, Abbott maintains that not *all* evidence "that might somehow involve 'marketing,' 'customers,' or 'market competitive information'" should be excluded.[12] Indeed, some of that evidence may be relevant to Epocal's intent to harm Abbott, which is an element of Abbott's tortious interference claim, or to Epocal's affirmative defense of unclean hands, which rests on the theory that Abbott filed this lawsuit in an effort to force Epocal out of the market.[13]  That may be, but is not necessarily, true. Thus, to preclude plaintiff's counsel from attempting to slip any of the excluded and prejudicial evidence through the back door of trial, counsel *must* first approach the bench and request a side-bar conference to discuss any of the foregoing evidence *before* it may be referred to or offered in the presence of the jury.

## II. EPOCAL'S MOTION TO EXCLUDE ARGUMENTS AND EVIDENCE REGARDING EPOCAL'S FDA 510(k) SUBMISSIONS

In order to obtain approval from the federal Food and Drug Administration ("FDA") to market a new medical device, a company must submit a notification that the device is "substantially equivalent" to one that is already on the market (the "predicate device").  21 U.S.C. § 360e(b)(1)(B).  This notification is referred to as a

---

[12] *Id.* at 2.

[13] As the court already has decided in its memorandum opinion and order addressing Abbott's Motion *In Limine* to Preclude Epocal from Presenting its Equitable Defenses of Unclean Hands and Equitable Estoppel to the Jury, Epocal will be permitted to present evidence regarding its affirmative defenses of unclean and equitable estoppel to the jury in an advisory capacity.

"510(k) notification."[14]   The terms "substantially equivalent" and "substantial equivalence" have special meanings in the context of  FDA 510(k) notifications. They mean that

> the device has the same intended use as the predicate device and that the Secretary by order has found that the device —
>
> > (i) has the same technological characteristics as the predicate device, or
> >
> > (ii) (I) has different technological characteristics and the information submitted that the device is substantially equivalent to the predicate device contains information, including appropriate clinical or scientific data if deemed necessary by the Secretary or a person accredited under section 360m of this title, that demonstrates that the device is as safe and effective as a legally marketed device, and (II) does not raise different questions of safety and effectiveness than the predicate device.

21 U.S.C. § 360c(i)(1)(A).

Epocal submitted a 510(k) notification to the FDA regarding the "EPOC Blood Analysis System" in 2006.[15]  Epocal identified Abbott's i-Stat Analyzer as a predicate product, and it claimed that its own EPOC system was "substantially equivalent" to

---

[14] "The [FDA's] review of devices for substantial equivalence is known as the § 510(k) process, named after the statutory provision describing the review." *Riegel v. Medtronic, Inc.,* 552 U.S. 312, 317 (2008).  The referenced statutory provision is § 510(k) of the Federal, Food, Drug, and Cosmetic Act, and it is codified at 21 U.S.C. § 360(k).

[15] Doc. no. 250 (Memorandum in Support of Motion *In Limine* to Exclude Arguments and Evidence Regarding Epocal's FDA 510(k) Submissions), at Exhibit 2 (510(k) submission for EPOC Blood Analysis System).

the i-Stat system.[16]  Epocal now seeks a ruling to prevent Abbott from using any evidence regarding Epocal's 510(k) submission.  Epocal's primary argument is that Abbott should not be allowed to use such evidence to argue that Epocal's device infringes Abbott's patents under the Doctrine of .  In response, Abbott makes clear that it will not be relying on the Doctrine of Equivalents to support its infringement claims at trial.[17]

Despite that concession, Abbott goes on to argue that, even if it cannot rely on Epocal's 510(k) notification to support a Doctrine of Equivalents theory, it should, nevertheless, be allowed to present evidence of factual statements made in Epocal's 510(k) submission — and, in particular, statements about how Epocal's device functions — for impeachment and other purposes.  Abbott also argues that Epocal's characterization of the Epocal system as "substantially equivalent" to the i-Stat system is relevant, because Epocal's expert witnesses have been permitted to testify about comparisons between the i-Stat device and the EPOC system.  According to Abbott,

> Epocal's experts will likely testify that the Epocal System is different from the i-Stat device manufactured by APOC.   Contradictory

---

[16] *Id.* at 5.

[17] Doc. no. 267 (Abbott's Response to Epocal's Motion *In Limine* to Exclude Arguments and Evidence Regarding Epocal's FDA 510(k) Submissions), at 3 ("While Epocal states otherwise in its Motion, Abbott had previously confirmed to Epocal, and has also indicated to the Court, that it is **not** pursuing a Doctrine of Equivalents infringement theory in this case.") (emphasis in original).

statements that Epocal made to the FDA comparing the two devices, and concluding they are substantially equivalent, are therefore highly relevant and probative. In particular, Abbott should not be precluded from using such statements for impeachment purposes if Epocal attempts to rely on device comparisons for its non-infringement arguments.[18]

Abbott does not cite any authority to support its argument, and, unfortunately for Abbott, there is ample authority supporting the opposite conclusion. The Federal Circuit has cautioned that evidence supporting a finding of "substantial equivalence" in the FDA 510(k) context should *not be* confused with the proof required to support a claim of patent infringement under the Doctrine of Equivalents. Indeed, as the Federal Circuit instructed in *Abbott Laboratories v. Sandoz, Inc.,* 566 F.3d 1282 (Fed. Cir. 2009):

While bioequivalency[19] may be relevant to the function prong of the

---

[18] *Id.* at 5.

[19] "Bioequivalency" is a pharmaceutical term used to assess the expected *in vivo* biological equivalence of two proprietary preparations of a drug. If two products are said to be "bioequivalent," it means that they would be expected to be, for all intents and purposes, the same. The United States Food and Drug Administration (FDA) has defined "bioequivalence" as referring to

the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study.

21 C.F.R. § 320.1. *See also*, *e.g.*, U.S. Dept. of Health & Human Services, Food and Drug Admin., Center for Drug Evaluation and Research, *Guidance for Industry: Bioavailability and Bioequivalence Studies for Orally Administered Drug Products — General Considerations*, ¶ II(C) at 4 (Mar. 2003 ed., Rev. 1). A copy of that publication may be at found at www.fda.gov/downloads/ Drugs/GuidanceComplianceRegulatoryInformation/Guidances/ucm070124.pdf.

> function-way-result test [for the Doctrine of Equivalents],
> bioequivalency and equivalent infringement are different inquiries.
> Bioequivalency is a regulatory and medical concern aimed at
> establishing that two compounds are effectively the same for
> pharmaceutical purposes. *In contrast, equivalency for purposes of
> patent infringement requires an element-by-element comparison of the
> patent claim and the accused product, requiring not only equivalent
> function but also equivalent way and result.* Different attributes of a
> given product may thus be relevant to bioequivalency but not equivalent
> infringement, and vice versa.

*Id.* at 1298 (footnote, alteration, and emphasis supplied). *See also, e.g., The Johns
Hopkins University v. Datascope Corp.,* 543 F.3d 1342, 1349 n.3 (Fed. Cir. 2008)
("FDA equivalence is irrelevant to patent law because it involves fundamentally
different inquiries.").

Thus, as the district court noted in *Ethicon Endo-Surgery, Inc. v. Hologic, Inc.,*
689 F. Supp. 2d 929 (S.D. Ohio 2010), "[s]everal district courts have held that it is
not proper to consider statements made in a FDA 510K notification." *Id.* at 936
(citing *Abbott Laboratories. v. Sandoz, Inc.,* 486 F. Supp. 2d 767, 776 (N.D. Ill.
2007); *CardioVention, Inc. v. Medtronic, Inc.,* 483 F. Supp. 2d 830, 840 (D. Minn.
2007); *Sunrise Med. HHG, Inc. v. AirSep Corp.,* 95 F. Supp. 2d 348, 405-06 (W.D.
Pa. 2000); and *Univ. of Fla. Research Foundation, Inc. v. Orthovita, Inc.,* No.
1:96-cv-82-MMP, 1998 WL 34007129 (N.D. Fla. Apr. 20, 1998)).

Abbott points out that all of the cited cases excluding evidence of FDA 510(k)

submissions in patent infringement cases have done so in the context of a Doctrine of Equivalents analysis.  None of the cases explicitly state that the same evidence could not be used for some other purpose, such as impeaching an expert witness, as Abbott proposes that the testimony be used here.  Even so, the court concludes that the same reasons justifying exclusion of 510(k) evidence to support a theory of infringement under the Doctrine of Equivalents also support excluding the evidence for other purposes, including impeachment.  Evidence of statements made and product descriptions given by Epocal in its 510(k) notifications might have some probative value for impeachment purposes, if Epocal attempts to offer a different description of the design or function of its device at trial.  But the risk for prejudice and jury confusion as a result of that evidence is simply too high.  There undoubtedly are similarities between Abbott's i-Stat device and Epocal's EPOC device.  If there were not, Abbott's infringement claims in this suit probably would be frivolous. When Epocal was petitioning for FDA approval to market its device, it was in Epocal's best interest to highlight those similarities, so it could argue that its device and Abbott's i-Stat predicate device were "substantially equivalent." But the standard for "substantial equivalence" in the FDA-approval context is so different from the standards for evaluating the similarity of inventions in the patent infringement context that the jury could easily be confused about the significance of statements made to the

FDA.  Specifically, the jury could be misled into believing that Epocal's statements to the FDA — even descriptive statements about the design and function of Epocal's device — are supportive of patent infringement.  The jury also could be misled into analyzing the evidence under something like a Doctrine of Equivalents theory, even though no such theory actually is being asserted here.

Accordingly, *all* evidence regarding Epocal's 510(k) submissions to the FDA — including both descriptive statements about the EPOC device, and statements about its "substantial equivalence" to Abbott's i-Stat predicate device — will be excluded.  Abbott will not suffer undue prejudice as a result of this holding.  If Epocal's expert witnesses testify that the EPOC system is different from the i-Stat device manufactured by Abbott, Abbott is free to cross-examine those witnesses using the testimony of its own expert witnesses, or the results of its own comparisons of the two devices.  In other words, it will not be necessary, for impeachment purposes, for Abbott to show that Epocal gave a different description of its device, in a different context, to a different government agency.  The parties' different analyses of the two competing products can speak for themselves.

### III. EPOCAL'S MOTION TO EXCLUDE DOCUMENTS THAT USE CERTAIN CLAIM TERMS OUTSIDE THE CONTEXT OF THE PATENTS-IN-SUIT

Epocal next asks the court to exclude from evidence certain internal documents

generated by Epocal during the design process for the EPOC device, as well as any

deposition testimony regarding those documents.[20]  According to Epocal,

> [t]he documents at issue use words that happen to appear in the claim terms of the asserted patent claims, such as "reservoir" and "equilibrated."  These documents, however, predate the lawsuit and the Court's construction of the claim terms at issue.  And for each of these words, the Court's claim construction adopted specific meanings that are different from the sense that the words were being used in the Epocal documents.  Thus the documents themselves bear little, if any, probative value of patent infringement.

> This low probative value is substantially outweighed by the danger of unfair prejudice and juror confusion from these, or similar, exhibits or testimony.  A jury seeing these terms used in Epocal's documents, [sic] may infer improperly that particular claim limitations are satisfied simply because the wording in the documents is identical or similar to certain claim terms, but without considering the very specific requirements accorded the claim terms by the court's claim construction.[21]

In response, Abbott argues that Epocal's own internal documentation is a valid

source of information about the design of the EPOC device and how it works.

Indeed, this court already decided in the memorandum opinion and order denying

Epocal's *Daubert* motion to exclude the testimony of Dr. James Tusa, Abbott's expert

witness, that Dr. Tusa was justified in relying upon Epocal's internal experimental

---

[20] Specifically, Epocal refers to the following documents: (1) PX 69, at pages E137990-99 (2) PX 72, at pages E149184-96; (3) PX 70, at pages EDHF002804-10; (4) PX 71, at pages EDHF002811-16; and (5) PX 74, at EDHF004401-06, as well as any related deposition testimony or other documents.

[21] Doc. no. 248 (Epocal's Memorandum in Support of its Motion to Exclude Documents that Use Certain Claim Terms Outside the Context of the Patents-In-Suit), at 1.

data to form his opinions.[22]  Abbott also asserts that the internal Epocal documents could be relevant for impeachment of Dr. Imants Lauks, Epocal's founder, and Epocal's experts, Dr. William Olbricht and Dr. Ranil Wickramasinghe, who may offer testimony that contradicts the information contained in the internal documents.

The court recognizes both the probative value of this evidence to Abbott's case, and the potential for unfair prejudice that could result to Epocal if the jury disregards the court's claim constructions due to the use of key words like "equilibration" or "reservoir" in Epocal's internal documents.  The court concludes that the best approach for balancing these two competing interests is that proposed by Epocal: *i.e.,* Abbott will be permitted to present the contested documents to the jury, but the court will issue a limiting instruction explaining that the use of terms like "reservoir," "equilibrate," and "equilibration" in those documents is not necessarily consistent with the court's construction of those claim terms, and is not an admission by Epocal that its device meets any of the limitations of the asserted claims.  The court also will remind the jury that they must apply the court's construction of the claim terms — not a construction of the terms that was used in some other context — to the Epocal device to decide infringement.[23]  Thus, Epocal's motion will be denied, and the court

---

[22] Doc. no. 215 (Memorandum Opinion and Order on *Daubert* Motions), at 24-26.

[23] *See* doc. no. 248, at 8.  Epocal also asked the court to redact all references to the terms "reservoir," "equilibrate," and "equilibration" in the questioned documents. *Id.*  The court concludes that measure is unnecessary and would only result in an incomplete understanding by the jury of the

will address some of Epocal's concerns by use of a limiting instruction.  Counsel for

Epocal should present this court and opposing counsel a draft of a proposed limiting

instruction on or before Friday, April 20, 2012.  Any objection should be filed no

later than the following Monday, April 23, 2012.

## IV. EPOCAL'S MOTION TO EXCLUDE ARGUMENTS AND EVIDENCE REGARDING SOLICITATION OF EMPLOYEES OTHER THAN THE FIVE AT ISSUE IN ABBOTT'S TORTIOUS INTERFERENCE ALLEGATIONS

In support of its claim for tortious interference with contractual relationships,

Abbott alleges that Epocal successfully solicited five employees — Dan McLain,

Wendy Thompson, Mark Maund, Martin Bemer, and Peggy Wachowski — to

terminate their employment with Abbott and begin working for Epocal.[24]  Epocal

seeks to preclude Abbott from introducing evidence of any other employees who may

also have been approached by Epocal, but who did not ultimately terminate their

employment with Abbott.

Abbott uses its employee Lisa Reece as an example.  On June 19, 2007, Jeff

Baker, an Epocal employee, sent Reece an e-mail stating, in pertinent part:  "We

would like to try and recruit you to our company."  Baker stated in another e-mail

---

contents of the documents.  The limiting instruction described above will be sufficient to eliminate any unfair prejudice or jury confusion.

[24] *See* doc. no. 1 (Complaint), at ¶¶ 62-68; doc. no. 269 (Abbott's Amended Response to Epocal's Motion to Exclude Evidence and Argument Regarding Solicitation of Employees Other Than the Five at Issue in Abbott's Tortious Interference Allegations), at 2 n.1

sent to Reece the following day, June 20, 2007: "Seriously, I would like to hire you. Things to think about?  No company car, Large territory, Lower Base Salary but a larger upside and stock at the ground floor.  You would do well working with all of us."[25]  During her September 10, 2010 deposition, Reece testified that Jeff Baker contacted her "periodically" to discuss her coming to work for Epocal.  Reece sent her resume to Baker in late 2007, and the two individuals met in person to discuss the potential career move on three or four occasions.  Epocal eventually made Reece a verbal job offer that included a higher salary than she earned at Abbott, but Reece rejected the offer because she felt Abbott was a good company to work for, and she believed in the i-Stat product.[26]

Epocal asserts that this evidence — and any similar evidence regarding other employees — should be excluded because it is not relevant to any fact in dispute, is improper character evidence, is unfairly prejudicial to Epocal, and would mislead the jury and confuse the issues.  According to Epocal, any such evidence would "mislead the jury into inferring that Epocal also tried to recruit the five Abbott employees whom it hired."[27]

The essence of Epocal's arguments is Federal Rule of Evidence 404, which

---

[25] Doc. no. 249, Exhibit 1 (Plaintiff's Exhibit 400), at 1.

[26] Doc. no. 249, Exhibit 2 (excerpts from the Deposition of Lisa Reece), at 235-40.

[27] Doc. no. 249, at 2.

provides, in pertinent part, that: "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Fed. R. Evid. 404(a). Under that rule, if Abbott was offering the evidence about Lisa Reece and other employees to suggest to the jury that, since Epocal (albeit unsuccessfully) attempted to recruit Reece, it must also have recruited McLain, Thompson, Maund, Bemer, and Wachowski, it would be inadmissible.

Abbott asserts, however, that evidence of Epocal's alleged attempts to lure other employees away from Abbott's employment falls under an exception to Rule 404(a), allowing such evidence to be admitted for the purpose of proving a matter — such as intent or motive — other than action in conformity with the actor's alleged character or prior bad actions. *See* Fed. R. Evid. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). The Eleventh Circuit has elaborated on that exception:

> Subject to specific exceptions, Rule 404(b) provides that extrinsic evidence is not admissible to prove defendant's character in order to show action in conformity therewith. Such evidence is, however, admissible if it is relevant to other material issues in the case. Specifically, the test for admissibility of extrinsic evidence under Rule 404(b) that we apply has three parts:

> First, the evidence must be relevant to an issue other than the defendant's character.  Second, as part of the relevance analysis, the evidence must be sufficient to support a finding that the defendant actually committed the extrinsic act.  Third, the probative value of the evidence must not be substantially outweighed by unfair prejudice.

*United States v. Calderon,* 127 F.3d 1314, 1330-31 (11th Cir. 1997) (quoting *United States v. Diaz–Lizaraza*, 981 F.2d 1216, 1224 (11th Cir. 1993), and citing *United States v. Beechum*, 582 F.2d 898 (5th Cir.1978)[28] (*en banc*), *cert. denied*, 440 U.S. 920 (1979)).

According to Abbott, evidence of Epocal's attempts to lure other employees away from Abbott could be relevant to prove Epocal's intent and motive, both of which are essential elements of its tortious interference claim.  Under New Jersey law, which the parties agree applies to Abbott's tortious interference claim:

> A complaint based on tortious interference must allege facts that show some protectable right — a prospective economic or contractual relationship.  Although the right need not equate with that found in an enforceable contract, there must be allegations of fact giving rise to some "reasonable expectation of economic advantage." *Harris v. Perl*, [197 A.2d 359, 363 (N.D. 1964)].  A complaint must demonstrate that a plaintiff was in "pursuit" of business.  Second, the complaint must allege facts claiming that the interference was done intentionally and with "malice." *Louis Kamm, Inc. v. Flink*, [175 A. 62, 66-67 (N.J. Err. & App. 1934)]; *Kopp, Inc. v. United Technologies, Inc.*, 223 N.J. Super. 548, 559, 539 A.2d 309 (App. Div. 1988); *Levin v. Kuhn Loeb & Co.*,

---

[28] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

174 N.J. Super. 560, 573, 417 A.2d 79 (App. Div. 1980) (applies New York law). For purposes of this tort, "[t]he term malice is not used in the literal sense requiring ill will toward the plaintiff." *Restatement (Second) of Torts* Chapter 37 at 5 (introductory note) (1979). Rather, malice is defined to mean that the harm was inflicted intentionally and without justification or excuse. *Rainier's Dairies v. Raritan Valley Farms, Inc.*, 19 N.J. 552, 563, 117 A.2d 889 (1955). Third, the complaint must allege facts leading to the conclusion that the interference caused the loss of the prospective gain. A plaintiff must show that "if there had been no interference[,] there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Leslie Blau Co. v. Alfieri*, 157 N.J. Super. 173, 185-86, 384 A.2d 859 (App. Div.), *certif. denied sub nom. Leslie Blau Co. v. Reitman*, 77 N.J. 510, 391 A.2d 523 (1978). Fourth, the complaint must allege that the injury caused damage. *Norwood Easthill Assocs. v. Norwood Easthill Watch*, 222 N.J. Super. 378, 384, 536 A.2d 1317 (App. Div. 1988).

*Printing Mart-Morristown v. Sharp Electronics Corp.*, 563 A.2d 31, 37 (N.J. 1989). *See also Deluxe Bldg. Systems, Inc. v. Constructamax, Inc.*, No. 06-2996(ES), 2012 WL 967362, at * 3-4 (D. N.J. March 21, 2012) (slip copy) (citing the same elements); *Gaelick v. Connecticut General Life Ins. Co.*, No. 11-2464(SRC), 2011 WL 3794228, at *2 (D. N.J. Aug. 25, 2011) (slip copy) (same).

In the tortious interference context, "'Interference is intentional "if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action."'" *Gaelick*, 2011 WL 3794228, at *3 (quoting *Cedar Ridge Trailer Sales, Inc. v. National Community Bank of New Jersey*, 312 N.J. Super. 51, 711 A.2d 338, 345 (N.J. Super. Ct. App. Div. 1998)). Thus,

implicit in the meaning of the term "malice" in the context of a tortious interference claim under New Jersey law is "acceptance of the principle that the requisite intent may be either a specific intent to interfere with the contract or the taking of improper action with knowledge that interference will probably result." *Velop, Inc. v. Kaplan*, 693 A.2d 917, 926 (N.J. Super. Ct. App. Div. 1997).

The court agrees with Abbott that evidence of Epocal's *unsuccessful* attempts to hire away Abbott's employees could be relevant to prove Epocal's "intent" to hire away the employees who actually are the subject of Abbott's claim. Therefore, the evidence could be admissible under Federal Rule of Evidence 404(b)(2), even if it would otherwise be inadmissible under Rule 404(a) or 404(b)(1). Furthermore, such evidence would be relevant to Abbott's tortious interference claim, in that Epocal's alleged solicitation of Lisa Reece occurred during approximately the same time period of its alleged solicitation of Dan McLain, Wendy Thompson, Mark Maund, Martin Bemer, and Peggy Wachowski, and it happened in a similar manner: *i.e.,* Jeff Baker contacted some of the other employees on Epocal's behalf, just as he had contacted Lisa Reece. Finally, the court concludes that the risk of unfair prejudice to Epocal if the jury hears such evidence does not outweigh the probative value of the evidence to Abbott. If necessary, the jury can be provided with a limiting instruction that the evidence should only be considered in determining Epocal's intent, not to

19

demonstrate that, just because Epocal may have attempted to hire away Reece, it also attempted to hire away McLain, Thompson, Maund, Bemer, and Wachowski. *See Calderon,* 127 F.3d at 1333 (holding that "any unfair prejudice that may have existed was mitigated by the district judge's limiting instruction"). Again, counsel for Epocal should present this court and opposing counsel a draft of a proposed limiting instruction on or before Friday, April 20, 2012. Any objection should be filed no later than the following Monday, April 23, 2012.

In summary, Abbott will be permitted to present evidence regarding Epocal's alleged attempts to hire away Lisa Reece, as well as similar evidence regarding other employees, as long as Epocal's alleged solicitation of other employees occurred during approximately the same time period, and in a similar manner, as the alleged solicitation of the five employees made the basis of Abbott's tortious interference claim.

## V. CONCLUSION AND ORDERS

In accordance with the foregoing, Epocal's motion to exclude evidence and argument that Abbott has been harmed by Epocal's alleged conduct is GRANTED in part, with regard to PX 273, 325-28, 354-56, 395, 403, 416, 418, 432, 438, and 449-51. In all other respects, the motion is DENIED, but counsel are cautioned that they must comply with all imitations on the presentation of evidence set forth in this

memorandum opinion and order.

Epocal's motion to exclude evidence and argument regarding its FDA 510(k) submissions is GRANTED.   No evidence regarding Epocal's FDA 510(k) submissions will be allowed at trial by either party.

Epocal's motion to exclude documents that use certain claim terms outside the context of the patents-in-suit is DENIED, but a limiting instruction will be issued. Counsel for Epocal should present this court and opposing counsel a draft of a proposed limiting instruction on or before Friday, April 20, 2012.  Any objection should be filed no later than the following Monday, April 23, 2012.

Epocal's motion to exclude arguments and evidence regarding solicitation of employees other than the five at issue in Abbott's tortious interference allegations is DENIED, but a limiting instruction may be issued if necessary.   Again, counsel for Epocal should present this court and opposing counsel a draft of a proposed limiting instruction on or before Friday, April 20, 2012.  Any objection should be filed no later than the following Monday, April 23, 2012.

**DONE** and **ORDERED** this 18th day of April, 2012.

_____
United States District Judge